IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

AMANDA J. STEINER, )
)
      Plaintiff, )
)
vs. ) Case No. 16-cv-1280-JPG-CJP
)
NANCY A. BERRYHILL, )
Acting Commissioner of Social Security, )
)
      Defendant.[1] )

## MEMORANDUM and ORDER

In accordance with 42 U.S.C. § 405(g), plaintiff Amanda J. Steiner, represented by counsel, seeks judicial review of the final agency decision denying her application for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) pursuant to 42 U.S.C. § 423.

## Procedural History

Plaintiff filed for DIB and SSI on May 15, 2013, alleging a disability onset date of September 30, 2012. Administrative Law Judge (ALJ) Jason Yoder conducted an evidentiary hearing on September 24, 2015, and issued an unfavorable decision on October 9, 2015. (Tr. 11-24.) The Appeals Council denied plaintiff's request for review and the ALJ's decision became the final agency decision. (Tr. 1-3.) Plaintiff exhausted her administrative remedies and filed a timely complaint with this Court.

## Issues Raised by Plaintiff

Plaintiff raises the following points:

1. The ALJ's residual functional capacity ("RFC") determination was erroneous because it was not grounded in evidence; the ALJ failed to analyze the opinion of plaintiff's treating

---

[1] Nancy A. Berryhill is now the Acting Commissioner of Social Security. *See* https://www.ssa.gov/agency/commissioner.html (visited Feb. 7, 2017). She is automatically substituted as defendant in this case. *See* Fed. R. Civ. P. 25(d); 42 U.S.C. § 405(g).

physician pursuant to 20 C.F.R. § 404.1527(c); and the ALJ failed to consider plaintiff's fibromyalgia based on appropriate medical criteria.

2. The ALJ erred in evaluating plaintiff's subjective complaints.

### **Applicable Legal Standards**

To qualify for DIB or SSI, a claimant must be disabled within the meaning of the applicable statutes.[2] For these purposes, "disabled" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. 42 U.S.C. § 423(d)(3). "Substantial gainful activity" is work activity that involves doing significant physical or mental activities, and that is done for pay or profit. 20 C.F.R. § 404.1572.

Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled. The Seventh Circuit Court of Appeals has explained this process as follows:

> The first step considers whether the applicant is engaging in substantial gainful activity. The second step evaluates whether an alleged physical or mental impairment is severe, medically determinable, and meets a durational requirement. The third step compares the impairment to a list of impairments that are considered conclusively disabling. If the impairment meets or equals one of the listed impairments, then the applicant is considered disabled; if the impairment does not meet or equal a listed impairment, then the evaluation continues. The fourth step assesses an applicant's residual functional capacity

---

[2] The statutes and regulations pertaining to DIB are found at 42 U.S.C. § 423, *et seq.*, and 20 C.F.R. pt. 404. The statutes and regulations pertaining to SSI are found at 42 U.S.C. § 1382 and 1382c, *et seq.*, and 20 C.F.R. pt. 416. As is relevant to this case, the DIB and SSI statutes are identical. Furthermore, 20 C.F.R. § 416.925 detailing medical considerations relevant to an SSI claim, relies on 20 C.F.R. Pt. 404, Subpt. P, the DIB regulations. Most citations herein are to the DIB regulations out of convenience.

("RFC") and ability to engage in past relevant work. If an applicant can engage in past relevant work, he is not disabled. The fifth step assesses the applicant's RFC, as well as his age, education, and work experience to determine whether the applicant can engage in other work. If the applicant can engage in other work, he is not disabled.

*Craft v. Astrue*, 539 F.3d 668, 674 (7th Cir. 2008); *accord Weatherbee v. Astrue*, 649 F.3d 565, 568-69 (7th Cir. 2011).

Stated another way, it must be determined: (1) whether the claimant is presently unemployed; (2) whether the claimant has an impairment or combination of impairments that is serious; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education and work experience. 20 C.F.R. § 404.1520; *Simila v. Astrue*, 573 F.3d 503, 512-13 (7th Cir. 2009); *Schroeter v. Sullivan*, 977 F.2d 391, 393 (7th Cir. 1992).

If the answer at steps one and two is "yes," the claimant will automatically be found disabled if he or she suffers from a listed impairment, determined at step three. If the claimant does not have a listed impairment at step three, and cannot perform his or her past work (step four), the burden shifts to the Commissioner at step five to show that the claimant can perform some other job. *Rhoderick v. Heckler*, 737 F.2d 714, 715 (7th Cir. 1984); *see also Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001) (Under the five-step evaluation, an "affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled. . . . If a claimant reaches step 5, the burden shifts to the ALJ to establish that the claimant is capable of performing work in the national economy.").

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that no mistakes of law were made. It is important to recognize that the scope of review is limited. "The findings of the Commissioner of Social Security as to any

fact, if supported by substantial evidence, shall be conclusive . . . ." 42 U.S.C. § 405(g). Thus, this Court must determine not whether plaintiff was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made. *See Books v. Chater*, 91 F.3d 972, 977-78 (7th Cir. 1996) (citing *Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995)). This Court uses the Supreme Court's definition of substantial evidence, *i.e.*, "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does <u>not</u> reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. *Brewer v. Chater*, 103 F.3d 1384, 1390 (7th Cir. 1997); *Moore v. Colvin*, 743 F.3d 1118, 1121 (7th Cir. 2014). However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner. See *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.

### **The Decision of the ALJ**

ALJ Yoder followed the five-step analytical framework set forth above. He determined that plaintiff met the insured requirements through December 31, 2016, and had not engaged in substantial gainful activity since September 30, 2012. ALJ Yoder opined that plaintiff had severe impairments of fibromyalgia, minimal lumbar spine degenerative disc disease (DDD), and migraine headaches. (Tr. 13.)

The ALJ then determined that plaintiff had the RFC to perform sedentary work with several restrictions, including that she would be off-task five percent of the workday. (Tr. 15.) He also determined that plaintiff was unable to perform past relevant work but was able to perform other jobs that existed in the economy. Thus, plaintiff was found not disabled. (Tr. 22-24.)

4

## The Evidentiary Record

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order. The following summary of the record is directed to the points raised by plaintiff.

1. **Agency Forms**

Plaintiff was born on January 7, 1979, and was thirty-three years old on the alleged onset date. (Tr. 207.) She indicated that depression, back problems, leg pain, and migraines limited her ability to work. (Tr. 212.)

Plaintiff earned her GED in 1997 and previously worked as a packer and loader at Signature Label, as a teacher at a daycare, and as a unit director at a house for mentally disabled adults. (Tr. 213.)

Plaintiff stated she was in constant pain and was unable to sit or stand for more than thirty minutes at a time. Her pain woke her up at night, and she had to lie down throughout the day. She could not do dishes or laundry. Lifting a gallon of milk and lifting her arms above her shoulders induced back pain. (Tr. 218, 242.)

Plaintiff took care of "him" by getting him lunch, watching television, and playing cards with him.[3] Plaintiff had difficulty bending and putting on her shoes. She was unable to sit in a bath tub without pain and could not stand in the shower for more than five minutes. She did not indicate that she had problems caring for her hair, shaving, feeding herself, or using the toilet. (Tr. 243, 249.)

Plaintiff prepared sandwiches and heated up leftovers twice per week but was unable to prepare a complete meal or perform household chores. When plaintiff went out, she drove or rode in a car but she could not sit in a car for more than twenty minutes. She could not go out by

---
[3] Based on plaintiff's testimony at the evidentiary hearing, the Court believes "him" is in reference to plaintiff's son.

herself because she needed assistance with lifting and walking. Plaintiff could not lift more than five pounds and could walk two blocks without needing to rest. Plaintiff grocery shopped at the store once per week for thirty minutes. She could pay bills, count change, handle a savings account, and use a checkbook. (Tr. 245, 247.)

Plaintiff's hobbies included reading, but she had to stop and change positions and lie down due to drowsiness. She socialized by watching movies and talking. (Tr. 246.)

Plaintiff could pay attention for ten minutes, she followed written instructions very well, and she was "average" at following spoken instructions. She got along with authority figures very well, was "average" at handling stress, and was "fair" at handling changes in routine. (Tr. 247-48.)

In a subsequent report, plaintiff stated she could not dress or bathe on certain days due to fibromyalgia and/or migraines. She spent approximately half her day lying down or reclining due to pain and fatigue. (Tr. 262.)

### 2. Evidentiary Hearing

ALJ Yoder presided over an evidentiary hearing on September 24, 2015, at which plaintiff was represented by counsel. (Tr. 30-84.)

Plaintiff lived with her husband and three children. Her children were seven, fifteen, and eighteen years old and were all in school at the time of the hearing. Plaintiff's husband worked during the day and her eighteen-year-old child helped take care of the other children in the summer time. Plaintiff's youngest child started kindergarten when he was six. The ALJ asked plaintiff who watched her son before he started kindergarten and plaintiff responded, "Me and – I get --." (Tr. 42-44.)

Plaintiff explained that her interaction with her son differed from her interaction with her older children when they were the same age as her son. She was able to take her older children

outside, while she spent time with her son by watching television or lying in bed and playing card games with him. (Tr. 46.)

About two to three days per week plaintiff helped her daughter prepare meals by opening hamburger helper packages. Plaintiff's entire home had wood floors. She swept slowly and stopped to recline halfway through for about fifteen to twenty minutes due to fatigue. Plaintiff swept about two times out of the last ten times her house was swept. After gripping a broomstick, plaintiff's hand cramped and she experienced pain. Plaintiff did not mop, vacuum, or clean bathrooms because of pain and fatigue. She was able to place laundry in the washer and dryer but needed assistance carrying the laundry. She did the laundry a lot more slowly than she used to. Plaintiff completed about two out of every ten loads of laundry. She folded laundry while sitting on her bed and halfway through she stopped to move around and then sat back down to finish the rest. Plaintiff's daughters put the laundry away. (Tr. 49-53.)

Plaintiff did not do yard work. She was unable to start a mower, but even if someone started it for her, she would not be able to mow because the vibrations made her hands tingle and go numb. (Tr. 53.)

Plaintiff's balance was not good and she fell in the shower the previous year. Plaintiff grocery shopped approximately one to two times out of every ten. She had to lean on the cart for support and sit down. After returning home from the grocery store, plaintiff would lie down or recline. (Tr. 53-54.)

Plaintiff had about six steps at her home and had to hold onto the handrail and climb them by putting both feet on the same stair rather than putting one foot in front of the other. She rested halfway because her legs felt like they were going to give out. (Tr. 55.)

Plaintiff indicated on her function report that she did not do any chores but testified at the hearing that she was able to perform some activities. This discrepancy exists because when she

filled out the report, her epidurals had run out. (Tr. 55.)

Plaintiff testified that her friend drove her to the hearing because she could not tolerate long-distance driving. Plaintiff drove around town about four days each week. She took her children to the bus stop about one to two blocks away. When the weather permitted, her children walked to the stop. Plaintiff also drove to Walmart about once per week. She had not been anywhere that required more than an hour of driving in the previous couple of years. (Tr. 58-60.)

Plaintiff had a smart phone, which she normally used for calling. She also used the phone to text, go on the Internet, play games, and post on Facebook about once or twice per week. (Tr. 60-61.)

Plaintiff reclined when she used her phone to go on the Internet and could only use it for about four to five minutes before her hands tingled and went numb. (Tr. 64.)

A vocational expert (VE) also testified at the hearing, and the ALJ instructed her to consider several hypothetical individuals with various RFCs.

The VE opined that an individual who was consistently off task five percent of the workday could still maintain employment. The "gray area" for being off task is between five and ten percent, but according to the VE, an individual would be unable to maintain employment if she were off task more than ten percent of the workday. (Tr. 75.)

On average, a person can be absent from her job once per month or ten to twelve times per year. Some employers do not permit any absences during a ninety-day probationary period. (Tr. 78-79.)

### 3. Medical Records

Plaintiff received primary care from Confidence Medical Associates from September 2012 through May 2013. Plaintiff reported back pain that ran into both of her legs and prevented her from working. Her physician opined that an MRI from January 2012 showed DDD. (Tr.

347-48.) In November 2012, plaintiff's doctor noted that her pain was more akin to peripheral neuropathy. (Tr. 334-37.) In March 2013, plaintiff's doctor stated that her lumbar radiculopathy was not responding to epidural injections. She was referred to a neurosurgeon. (Tr. 318-20.)

Plaintiff saw Dr. VanFleet at the Orthopedic Center of Illinois for an evaluation of her lumbar spine in May 2013. Dr. VanFleet opined that plaintiff had a normal examination and normal imaging studies. He stated she should continue independently with an exercise program at home. (Tr. 674-75.)

On June 28, 2013, plaintiff presented to the American College of Rheumatology. She reported constant pain in her back and legs, and pain in her arms, wrist, and hands in the morning. She indicated that her daughters did most of the house and yard work. She "sometimes" had difficulty using her hands to grasp small objects, walking, climbing stairs, descending stairs, sitting down, touching her feet while seated, dressing herself, staying asleep due to pain, obtaining restful sleep, and engaging in leisure time activities. She "usually" had problems getting up from a chair, reaching behind her back and head, going to sleep, working, and with morning stiffness. She marked "no" for problems with bathing, eating, and getting along with family members, and for using a walking assistive device. (Tr. 677-82.)

On June 28, 2013, plaintiff presented to Dr. Chad Ronholm for an initial evaluation and she reported pain virtually everywhere. A review of her systems was remarkable for significant fatigue on a daily basis as well as poor sleeping patterns secondary to her pain. She reported depression and migraines. She had generalized tenderness to palpation with fourteen out of eighteen trigger points, which was suggestive of fibromyalgia syndrome. Dr. Ronholm noted that Lyrica improved her symptoms, which made fibromyalgia more likely. He ordered labs, initiated amitriptyline for fibromyalgia pain, continued plaintiff's Lyrica, Percocet, and Nabumatone, and encouraged plaintiff to try to participate in routine exercise. (Tr. 683-85.)

During a follow-up with Dr. Ronholm in July 2013, plaintiff reported no significant change from her previous visit. Dr. Ronholm continued plaintiff's medications and strongly encouraged her to participate in routine exercises. (Tr. 686-87.) On November 22, 2013, plaintiff reported that Savella helped decrease generalized pain, but she still experienced pain virtually everywhere. She also reported daily fatigue and poor sleeping patterns and intermittent migraines. She stated she was walking for exercise without any significant difficulty. She had tenderness to palpation virtually everywhere with eighteen out of eighteen fibromyalgia trigger points. Dr. Ronholm assessed plaintiff with fibromyalgia and increased her Savella. Her Lyrica, Nabumatone, and ranitidine were continued. Plaintiff was strongly encouraged to participate in routine exercise on top of the walking she was doing. (Tr. 688-89.)

On March 28, 2014, plaintiff attended a follow-up appointment with Dr. Ronholm. She stated she fell out of the shower two weeks before. Plaintiff reported generalized pain, virtually everywhere. She was walking for exercise but it worsened her pain at times. (Tr. 690-91.)

On July 25, 2014, plaintiff presented to Dr. Ronholm and reported she was doing fairly well overall. She stated she had increased pain with leg cramps and achiness at nighttime, as well as some generalized pain from fibromyalgia, fatigue, and poor sleeping patterns. She reported her fibromyalgia was stable. Dr. Ronholm continued plaintiff's medications, told her to continue walking, and encouraged her to do some leg lifts and other low impact exercises for an hour. (Tr. 886-87.) On January 9, 2015, plaintiff stated the Lyrica, Savella, and Zanaflex were helping her symptoms, but she still experienced generalized pain virtually everywhere, along with fatigue and poor sleeping patterns. (Tr. 916-17.)

Plaintiff presented to Fayette County Hospital numerous times throughout the relevant period for a variety of reasons, including tremor-like activity in her arms and legs (Tr. 772-76), migraines (Tr. 780-84, 843-47, 919-34, 935-45), lower back pain (Tr. 793-97, 808-12), falling in

10

the shower (Tr. 813-18, 819-23), and abdominal pain (Tr. 946-47, 1003-05).

Plaintiff also underwent several studies throughout the relevant period. On February 22, 2013, an MRI of plaintiff's lumbar spine returned normal findings. (Tr. 304.) On March 6, 2013, plaintiff underwent a study which did not reveal any neurodiagnostic evidence of neuropathy or radiculopathy in either leg. (Tr. 402-04.) On April 2, 2013, images of plaintiff's lumbar spine showed minor spondylosis with no acute findings. An MRI of plaintiff's brain was unremarkable. (Tr. 302-03.) An MRI of her hips showed minor degenerative changes of the SI joints and questionably of the hips. There were no definite acute radiographic findings or evidence of osseous destructive lesion. Images of plaintiff's sacrum and coccyx showed mild sclerosis about the sacroiliac joints, suggesting minor degenerative change. (Tr. 388-90.) On April 10, 2013, an EEG was performed on plaintiff, which returned an unremarkable recording. (Tr. 419.) On September 11, 2013, an x-ray of her lumbar spine showed a stable appearance with very mild facet joint arthropathy at L5-S1 and minimal bony spurring. She was assessed with chronic lower back pain and given Norco. (Tr. 813-18.)

Plaintiff's neurologist was Dr. Joshua Warach. She treated with him on a regular basis from March 2013 through June 2014. His initial impressions included chronic lumbosacral and lower extremity pain syndrome and chronic migraines. (Tr. 415.) Beginning in August 2013, Dr. Warach also listed fibromyalgia under his impressions. (Tr. 620-21.) Dr. Warach instructed plaintiff to avoid heavy lifting, strain, and other provocative activities but stated that she "may certainly" work on a light duty basis. (Tr. 415-16.)

Plaintiff began receiving transforaminal lumbar epidural steroid injections from Dr. Ghalambor on December 20, 2012. (Tr. 576-78.) On November 6, 2013, plaintiff reported that the injections initially helped quite a bit but her pain returned over time. She was assessed with bilateral lumbar radiculopathy with frank sensorimotor deficit; lumbar DDD and bulges at L4-5

11

and L5-S1; mild lumbar facet arthropathy, bilateral, multilevel, and more pronounced at L3-4 and L4-5; and low back and bilateral leg pain which was unresponsive to medical management, partially responsive to physical therapy, and responsive in the short-term to epidural steroid injections. Dr. Ghalambor suggested plaintiff receive at least one more epidural steroid injection but noted that if she was still symptomatic afterwards, she should try facet injections. (Tr. 579-80.) On November 12, 2013, plaintiff received additional bilateral L4 and L5 transforaminal lumbar epidural steroid injections. (Tr. 590-91.) During a follow-up in December 2013, plaintiff reported that she experienced an overall thirty percent relief in her pain. She then received bilateral L3-4, L4-5, and L5-S1 lumbar intraarticular facet injections. Immediately afterwards, she performed activities that usually worsened her back pain. She reported fifty percent relief. Dr. Ghalambor noted that plaintiff had limited options and agreed with Dr. VanFleet that the anatomical abnormalities did not warrant any surgery. However, he pointed out that plaintiff's symptoms had been unresponsive to medical management, physical therapy, and epidural steroid injections. He thought it was reasonable to consider confirmatory facet injections and radiofrequency lesioning. (Tr. 581-87.) On March 19, 2014, plaintiff underwent lumbar facet injections. She reported that she experienced ninety percent improvement in her pain for about eight weeks following her previous injections. Her pain gradually returned over the previous month. (Tr. 709-12.) On April 7, 2014, plaintiff received bilateral lumbar intraarticular facet injections. Dr. Ghalambor again noted that plaintiff's low back pain was unresponsive to medical management, partially responsive to physical therapy, and responsive in the short term to previous epidural steroid injections. Immediately after the injections, plaintiff performed activities that usually worsened her back pain for an hour and she reported one hundred percent relief. (Tr. 706-07.) In June 2014, plaintiff stated that the injections gave her ninety percent relief, but they returned over the previous two weeks. Dr. Ghalambor recommended lumbar

radiofrequency lesioning for longer-term relief. (Tr. 869-71.) Plaintiff returned to Dr. Ghalambor in June and July 2014 for radiofrequency lesioning of her lumbar facet medial branches. (Tr. 872-74, 876-78.) She reported in January 2015 that the radiofrequency lesioning gave her between eighty to ninety percent relief in pain for about six months. However, the pain gradually returned. (Tr. 899-900.) Dr. Ghalambor repeated the lesioning in January and February 2015. (Tr. 903-05, 908-10.)

Plaintiff attended a follow-up appointment with Dr. Ronholm for her fibromyalgia on May 8, 2015, and reported no significant clinical changes. (Tr. 961-62.)

### 4. Dr. Ronholm's RFC Assessment

On August 7, 2015, Dr. Ronholm completed an RFC assessment of plaintiff. He opined that plaintiff was limited to sedentary work and listed a diagnosis of fibromyalgia. He did not address plaintiff's back problems. His objective findings included generalized tenderness to palpation and eighteen-out-of-eighteen trigger point tenderness. Dr. Ronholm explained that plaintiff's pain and/or fatigue would require plaintiff to take daily breaks from work activity outside of normal breaks, which totaled an hour or more in the course of an eight-hour workday. Dr. Ronholm also indicated that plaintiff should avoid concentrated exposure to extreme cold and heat, wetness, humidity, fumes, odors, dusts, gases, poor ventilation, and hazards. She should also avoid even moderate exposure to noise. He explained that extreme temperatures can worsen fibromyalgia complaints and noise can worsen migraine headaches. Due to fatigue and mental fogginess, hazards would be dangerous to plaintiff. Dr. Ronholm stated that plaintiff's impairments would result in her missing work about three times each month. (Tr. 1018-20.)

### 5. State Agency Consultant Record Reviews

Dr. Mehr performed a records review on November 21, 2013. He opined that plaintiff was mildly restricted in areas of activities of daily living and had mild difficulties maintaining

social functioning and concentration, persistence, or pace. (Tr. 89.)

Dr. Bilinsky performed a records review on November 25, 2013 and opined that plaintiff could occasionally lift and/or carry twenty pounds; frequently lift and/or carry ten pounds; stand and/or walk for a total of about six hours in an eight hour workday; and push and/or pull and unlimited amount. (Tr. 90-91.)

Dr. Smith conducted a records review on June 3, 2014. He opined that plaintiff was limited to occasionally lifting and/or carrying twenty pounds; frequently lifting and/or carrying ten pounds; standing and/or walking for a total of about six hours in an eight hour workday; sitting for a total of about six hour in an eight hour workday; and pushing and/or pulling an unlimited amount. (Tr. 109-110.)

Dr. Lanier performed a records review on June 3, 2014 and opined that plaintiff was mildly restricted in areas of activities of daily living and had mild difficulties maintaining social functioning and concentration, persistence, or pace. (Tr. 108-09.)

## Analysis

Plaintiff asserts that the ALJ erroneously evaluated the treating physician's opinions, along with plaintiff's subjective complaints. Because these two issues fold into one another, they will be addressed as one.

Plaintiff's treating physician, Dr. Chad Ronholm, opined that plaintiff's fibromyalgia restricted her to sedentary work and would result in plaintiff's taking an hour or more of breaks in addition to normal breaks during an eight-hour workday. He also stated that plaintiff's fibromyalgia would cause her to miss work approximately three times each month. Dr. Ronholm did not consider lumbar DDD or any other impairment in his assessment. (Tr. 1018-20.)

The ALJ afforded Dr. Ronholm's opinions "some weight" by accepting that plaintiff was limited to sedentary work. The ALJ, however, rejected Dr. Ronholm's opinions that plaintiff

would need to miss work three days each month and require an extra hour of breaks throughout the workday. Any error in rejecting these opinions is not harmless because the VE testified that these restrictions would preclude employment.[4]

The opinions of treating physicians are afforded controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques and [are] not inconsistent with other substantial evidence." *Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010). An ALJ can only reject treating source opinions for "good reasons." *Id.*

The ALJ opined that Dr. Ronholm's opinions related to absenteeism and being off-task were inconsistent with the record as a whole because plaintiff reported "good relief" from fibromyalgia medication and lumbar injections; plaintiff's symptoms were "stable;" plaintiff demonstrated a full range of motion of all extremities throughout the relevant period; and plaintiff's activities of daily living were inconsistent with a finding that she would miss more than three days of work per month. (Tr. 21.)

The ALJ's reliance on plaintiff's "good relief" from medication and injections is not logical. Dr. Ronholm assessed plaintiff's RFC in light of her fibromyalgia and determined that that impairment, alone, mandated excessive breaks and absenteeism. Therefore, whether the lumbar injections provided plaintiff relief from her back pain has no bearing on Dr. Ronholm's conclusions.

The ALJ also referenced plaintiff's "full range of motion of all extremities throughout the relevant period." (Tr. 21.) Again, this has no effect on Dr. Ronholm's assessment of plaintiff's fibromyalgia symptoms. Fibromyalgia is characterized by widespread pain and not a decreased range of motion. *See Fibromyalgia*, MAYO CLINIC, http://www.mayoclinic.org/diseases-

---

[4] The VE testified that employers generally tolerate one absence per month, or ten to twelve per year. (Tr. 78-79). Although the VE did not state specifically that being off task for an hour would preclude employment, she opined that an employee could not be off task for more than ten percent of the workday. Ten percent of an eight-hour workday is fifty minutes. Thus, a person who is off-task for an hour exceeds the ten percent threshold. (Tr. 76).

conditions/fibromyalgia/home/ovc-20317786 (visited Aug. 24, 2017).

The ALJ established a connection between plaintiff's back problems, her range of motion, and her fibromyalgia, without relying on any medical evidence. The Seventh Circuit has held on several occasions that an ALJ cannot "play doctor" and base his decisions on his own "independent medical findings." *Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996). By assuming that plaintiff's back symptoms and range of motion indicated improvement in plaintiff's fibromyalgia symptoms, the ALJ impermissibly substituted his own lay opinion for that of a medical expert.

Additionally, the ALJ did not cite to, and the court cannot find, where in the record plaintiff experienced "good relief" from fibromyalgia medication. There are several instances where plaintiff's medications "somewhat controlled" her fibromyalgia (Tr. 853), "were helping her symptoms" (Tr. 916), "improved her symptoms" (Tr. 683), or "decreased generalized pain" (Tr. 688). However, nearly each of these notations is accompanied by a statement that plaintiff continued to report pain "virtually everywhere." (Tr. 683, 688, 917.) During her second to last visit in the record, plaintiff told Dr. Ronholm that Lyrica, Savella, and Zanaflex were helping her symptoms, but she still experienced generalized pain virtually everywhere along with fatigue and poor sleeping patterns. (Tr. 916-17.) On the last visit of record, plaintiff reported no significant clinical changes. (Tr. 961.) Any statements indicating plaintiff experienced "good relief" from her fibromyalgia medications "were cherry-picked from the record, selected without consideration of the context in which they appear. An ALJ cannot rely only on the evidence that supports her opinion." *Bates v. Colvin*, 736 F.3d 1093, 1099 (7th Cir. 2013).

The ALJ's assessment also emphasized Dr. Ronholm's description of plaintiff's fibromyalgia as "stable." (Tr. 21.) As pointed out in *Murphy v. Colvin*, 759 F.3d 811, 819 (7th Cir. 2014), vaguely characterizing an individual's condition as "stable" is not an accurate

portrayal of a person's physical or mental state. "Simply because one is characterized as 'stable' or 'improving' does not necessarily mean that she is capable of doing [certain] work." *Id.*

Finally, the ALJ opined that plaintiff's activities of daily living were inconsistent with Dr. Ronholm's opinion that she needed additional breaks and days off work. According to the ALJ, plaintiff's activities of daily living included "caring for a young child, performing household chores, and preparing meals. . . ." (Tr. 21.) Even a cursory glance at the record shows this summary is superficial and cherry-picked:

<u>Caring for a young child:</u>  Plaintiff testified that her eighteen-year-old daughter helped care for her children. When asked who cared for her son while her other children were in school, plaintiff replied, "Me and – I get," before she was cut-off by the ALJ. Plaintiff spent time with her son by watching television or lying in bed and playing card games. (Tr. 42-46.)

<u>Performing household chores:</u> Plaintiff stated in her agency forms that she was unable to perform household chores. (Tr. 245.) She testified she could sweep for about fifteen minutes before resting and that sweeping caused her pain and fatigue. Plaintiff could place laundry in the washer and dryer and fold the clothes, but she was unable to carry the laundry. Plaintiff did not mop, vacuum, or clean bathrooms because of pain and fatigue. (Tr. 49-53.) She could not start a lawn mower and, even if someone started it for her, the vibrations made her hands go numb. (Tr. 53.)

<u>Preparing meals:</u> Plaintiff indicated she prepared sandwiches and heated up leftovers twice per week but was unable to prepare a complete meal. (Tr. 245.) She testified that about two to three days per week she helped her daughter cook by opening hamburger helper packages. (Tr. 49.)

The ALJ clearly cherry-picked from the record. He crafted support for his conclusion by taking evidence out of context. This is impermissible.

17

In sum, the ALJ failed to offer good reasons for rejecting Dr. Ronholm's opinions related to plaintiff's absenteeism and her ability to stay on task. The several reasons he set forth were either illogical or not supported by substantial evidence. Thus, remand is required.

## Conclusion

The Commissioner's final decision denying plaintiff's application for social security disability benefits is **REVERSED** and **REMANDED** to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence four of 42 U.S.C. § 405(g).

The Clerk of Court is directed to enter judgment in favor of plaintiff.

**IT IS SO ORDERED.**
**DATE:  August 28, 2017**

s/ J. Phil Gilbert
**J. PHIL GILBERT**
**DISTRICT JUDGE**